MIED (Rev. 03/11) Prisoner Civil Rights Complaint

2φ

| Official Use Only | | |
|---|---|---|
| Case Number | Judge | Magistrate Judge |
| | | |

Case:2:17-cv-11627
Judge: Steeh, George Caram
MJ: Patti, Anthony P.
Filed: 05-19-2017 At 10:02 AM
PRIS KITCHEN VS WINN, ET AL. (DP)

## PRISONER CIVIL RIGHTS COMPLAINT

*This form is for use by state prisoners filing under 42 U.S.C. § 1983 and federal prisoners filing pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).*

### Plaintiff's Information

| Name Michael A. Kitchen | Prisoner No. 189265 |
|---|---|

| Place of Confinement Earnest C. Brooks Correctional Facility | | | |
|---|---|---|---|

| Street 2500 S. Sheridan Road | City Muskegon Heights | State MI | Zip Code 49444 |
|---|---|---|---|

| Are there additional plaintiffs? | ☐ Yes | ☒ No |
|---|---|---|

*If yes, any additional plaintiffs to this action should be listed on a separate 8½" x 11" sheet of paper and securely attached to the back of this complaint. You must provide names, prisoner numbers and addresses for all plaintiffs.*

### Defendant's Information

| Name O'Bell T. Winn ~~O'Bell~~ | Position Warden |
|---|---|

| Street/P.O. Box Saginaw Correctional Facility 9625 Pierce Road | City Freeland | State MI | Zip Code 48623 |
|---|---|---|---|

| Are you suing this defendant in his/her: | ☒ Personal Capacity | ☒ Official Capacity | ☒ Both Capacities |
|---|---|---|---|

| Are you suing more than one defendant? | ☒ Yes | ☐ No |
|---|---|---|

*If yes, any additional defendants to this action should be listed on a separate 8½" x 11" sheet of paper and securely attached to the back of this complaint. You must provide their names, positions, current addresses and the capacity (personal, official or both) in which you are suing them.*

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL ANDREW KITCHEN,

      Plaintiff,

                           Case No. _____

v.

                           Honorable: _____

O'BELL WINN, et al.,

      Defendants.

_____/

## PREVIOUSLY FILED LAWSUITS

### WESTERN DISTRICT OF MICHIGAN

| Case No. | Caption | Filed | Status |
|---|---|---|---|
| 2:91-cv-00230 | Kitchen v. Osier | Filed: 09/12/91 | Closed: 01/30/96 |
| 1:93-cv-00034 | Kitchen v. Vidor | Filed: 01/13/93 | Closed: 04/07/93 |
| 1:93-cv-00792 | Kitchen v. Toombs | Filed: 09/30/93 | Closed: 01/22/96 |
| 1:93-cv-00944 | Kitchen v. Voet | Filed: 11/24/93 | Closed: 09/14/94 |
| 2:00-cv-00183 | Kitchen v. Bouchard | Filed: 09/29/00 | Closed: 08/06/03 |
| 2:05-cv-00267 | Kitchen v. MDOC | Filed: 11/03/05 | Closed: 01/10/06 |
| 2:06-cv-00251 | Kitchen v. Winn | Filed: 10/02/06 | Closed: 03/07/08 |
| 1:16-cv-00190 | Kitchen v. Snyder | Filed: 02/23/16 | Still Pending |
| 1:16-cv-01068 | Kitchen v. Corizon | Filed: 08/29/16 | Still Pending |

### EASTERN DISTRICT OF MICHIGAN

| Case No. | Caption | Filed | Status |
|---|---|---|---|
| 2:93-cv-71555 | Kitchen v. Kitchen | Filed: 04/14/93 | Closed: 05/13/93 |
| 2:14-cv-12883 | Kitchen v. Heyns | Filed: 07/23/14 | Still Pending |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL ANDREW KITCHEN,

       Plaintiff,

v.

O'BELL WINN, WILLIAM FOY,
NANNIE CULBERSON, THOMAS
HAYNES, K. MORRIS, COUNSELOR
CHALKER, OFFICER ODETTE,
OFFICER KARL, OFFICER GLYNN,
OFFICER TROMBLEY, & UNKNOWN
SUPERVISORS OR GUARDS,

       Defendants.

_____/

Case No. _____

Honorable: _____


**PRISONER CIVIL RIGHTS ACTION**


## CIVIL RIGHTS ACTION

    **NOW COMES** Plaintiff Michael Andrew Kitchen (Kitchen), proceeding pro se, and hereby files this action against O'Bell Winn, William Foy, Nannie Culberson, Thomas Haynes, K. Morris, Counselor Chalker, Officers Odette, Karl, Glynn, and Trombley, and Unknown supervisors or guards, and for his causes of action allege as follows:

### JURISDICTION AND VENUE

    1.  This Court has jurisdiction pursuant to 28 USC §§ 1331, 1343(3), and 2201 because this action involves a controversy with a value that exceeds $10,000, exclusive of interests and costs.

    2.  Venue for this action lies in the United States District Court for the Eastern District located in the Southern Division of the State of Michigan pursuant to 28 USC § 1391(a).

### P A R T I E S

    3.  That Kitchen incorporates Paragraphs 1-2 as though set forth verbatim herein.

4.   That Plaintiff Michael Andrew Kitchen is a U.S. citizen and a prisoner of the Michigan Department of Corrections (MDOC), currently confined at the Earnest C. Brooks Correctional Facility located in Muskegon Heights, Michigan.  At all relevant times herein, Kitchen was confined at the Saginaw Correctional Facility located in Freeland, Michigan.

5.   Defendants O'Bell Winn is employed as the Warden and William Foy employed as the Deputy Warden of Housing at the Saginaw Correctional Facility located at 9625 Pierce Road, Freeland, Michigan 48623.  They are being sued in their individual and official capacities.

6.   Defendants Nannie Culberson is employed as a  Resident Unit Manager and Thomas Haynes, Mr. Chalker, and K. Morris are employed as Prison Counselors also at the Saginaw Correctional Facility.  They are all being sued in their individual and official capacities.

7.   Defendants Karl, Odette, Glynn, and Trombley are employed as Corrections Officers also at the Saginaw Correctional Facility.  They are all being sued in their individual and official capacities.

8.   Defendants Unknown Supervisors or Guards are all employed as Corrections Officers or other employees also at the Saginaw Correctional Facility.  They are all being sued in their individual and officials capacities.

## GENERAL   ALLEGATIONS

9.   On October 7, 2016, Kitchen was transferred to the Saginaw Correctional (SRF) in Freeland, Michigan.

10.  Due to what is believed to have been concerns for Kitchen's safety, Kitchen was placed in SRF's Unit 1200, which is a housing unit in the SRF Level IV "Close Security" Division in the general prison population.

- 2 -

11. As will become relevant later herein, a brief description of SRF is necessary. SRF is described as a "multi-level" correctional facility, having a Level I, Level II, Level IV, and temporary segregation divisions. The Level I division consists of a single housing unit located outside the facility's security fence, and the segregation unit also consists of a single housing unit located within the security fence of SRF positioned behind the facility's Cafeteria or Dining Hall.

12. Levels II and IV sit right next to each other and is somewhat separated by a chain-linked fence. Each of these levels have three housing units, to wit: Units 700, 800, and 900 are designated as Level II housing units, and Units 500, 600, and 1200 are designated as the Level IV housing units.

13. Each housing unit at SRF is divided into four floors usually referred to as "wings", and each floor holds approximately 120 beds or sixty cells that are "double-bunked" (i.e., meaning two beds located in each cell), for a total number of approximately 500 prisoners to each housing unit in Levels II and IV. Each wing in each of these housing units are labeled A through D.

14. In the Level IV division of SRf, each housing unit has designated a wing as a disciplinary section or wing that prisoners and staff commonly refer to as the "Sanction Wing". However, there are some officials whom also refer to the Sanction Wing as the "Transition Wing", so Kitchen will use each term interchangeably to describe the disciplinary wing in these Level IV housing units.

15. Although it does not appear as if prison officials have promulgated official written rules creating these Sanction Wings and guiding official discretion on prisoner placement and release from these wings, it is

- 3 -

generally understood by both prisoners and staff as a result of common practice that Sanction Wings are normally reserved for prisoners who incur repeated misconducts, generally serving more than ten (10) days of disciplinary sanctions, have serious misconduct charges pending classified as "Class II Misconducts" and, therefore, are anticipated to serve disciplinary sanctions, or of whom have recently been released from SRF's temporary segregation unit after having served disciplinary detention sanctions.

16. This is because while these Sanction Wings are technically in the general prison population, prisoners confined on these Sanction Wings are kept absolutely isolated from prisoners in SRF's Level IV general prison population.

17. Prisoners on these Sanction Wings, or Sanction Wing prisoners, have times separate and apart from SRF's regular general population prisoners for use of the exercise yard, feedings, and showering, and therefore Sanction Wing prisoners will almost never come into contact with prisoners housed on the other wings within SRF's Level IV housing units.

18. Prisoners confined on each Sanction Wing within each Level IV housing unit do not have access to the same privileges as those in the general prison population, in that privileges for Sanction Wing prisoners are severely restricted with the prisoners on Unit 600's Sanction Wings suffering the most extreme restrictions of privileges.

19. These restrictions include, but are not necessarily limited too, the following:

a. <u>DISCIPLINARY REVIEWS</u>: The security classification committee at SRF routinely review the files of all prisoners housed on SRF's Sanction Wings in each Level IV housing unit. They also personally interview each prisoner under normal circumstances. This committee usually includes Defendants Winn, Foy, SRF's inspector, and/or an assistant unit supervisor. The purpose of the review is to determine a prisoner's release from the Sanction Wing.

b. <u>RELEASE FROM SANCTION WING</u>: If the security classification committee decides to release a prisoner from the Sanction Wing, he is placed on a Waiting List to await his turn to be moved from the Sanction Wing to a wing within the same or another Level IV housing unit that has not been designated as a disciplinary wing. The Waiting List is maintained by the assistant unit supervisor located in each Level IV housing unit.

c. <u>EXERCISE YARD</u>: Prisoners confined on Sanctions Wings are permitted to have only one hour of out-of-cell activity per day, and for those confined on Sanction Wings in Units 500 and 1200 that out-of-cell activity can be spent either on the small exercise yard located in front of each Level IV housing unit or spent in one of three dayrooms located indoors. Units 500 and 1200 are the only Level IV housing units that have three dayrooms, with one designated as a "quiet room", the other a "television room", and the last a "recreation room" that has a pool table, ping-pong table, and card tables. Unit 600 is the most restrictive and punitive, and has only two dayrooms and both have a television and dining hall tables. There is no recreational equipment (i.e., pool, ping-pong, or card tables) in these dayrooms. While Sanction Wing prisoners in Units 500 and 1200 have the option of going outdoors during their recreational time each day, that is not the case for Unit 600 Sanction Wing prisoners whom can only go outdoors on the small exercise yard in front of Unit 600 it seems every third or fourth day at which time they must go outdoors or are not permitted out-of-cell activity time for that day. The remaining two days must be spent indoors, otherwise they are not permitted out-of-cell activity time for that day. Prisoners in SRF's Level IV division that are not on Sanction Wings have out-of-cell activity three to four times daily for forty-five minutes to an hour, and they have the option of staying indoors in one of three dayrooms and using the telephone or spending their out-of-cell activity on the small exercise yard located in front of each Level IV housing unit. However, every three-days those prisoners who are not confined on Sanction Wings have, in addition their regular out-of-cell activity times, access to SRF's Big Exercise Yard for an hour, which contains various outdoor activities such as a running track, horseshoe pits for horseshoe playing, picnic tables, the weight pit, handball court, full-court basketball courts, a softball diamond for softball, exercise equipment such as pull-up and dip bars, and dozens of telephones. Prisoners confined on Sanction Wings are never permitted access to the Big Exercise Yard under any circumstances.

d. <u>SHOWERS</u>: Sanction Wing prisoners shower only every other day for a maximum of only ten minutes, as compared to prisoners that are not confined on Sanction Wings whom are permitted to shower daily for however-long they wish and even multiple times a day if they so choose.

e. <u>FACILITY PROGRAMS & ACTIVITIES</u>: Prisoners confined on Sanction Wings are not permitted to participate in any institutional programming or activities, such as holiday and recreational events scheduled by prison officials.

- 5 -

f. FACILITY DINING HALL: Prisoners that are confined on Sanction Wings are never permitted to have access to the facility's Cafeteria or Dining Hall, but must eat their meals either in their cells on the Sanction Wings or in a Level IV housing unit dayroom designated for this purpose. Furthermore, Sanction Wing prisoners are not served from the same menu as prisoners that are not confined on Sanction Wings (e.g., Sanction Wing prisoners are limited to only desserts on their food trays two out of three times that they are given meals). Prisoners that are not confined on Sanction Wings are permitted to eat their meals in SRF's Cafeteria or Dining Hall, and have desserts for all three meals.

g. PILLOW: Sanction Wing prisoners do not have a pillow in their cells. Prisoners that are not confined on Sanction Wings are provided with a pillow.

20. Units 500 and 1200 each have one Sanction Wing, including D-Wing being designated as the Sanction Wing in Unit 500 and A-Wing being designated as the Sanction Wing in Unit 1200. Unit 600 is the only housing unit that has two Sanction Wings, and this is be cause there are some cells on Unit 600's Sanction Wings that also act as holding cells for those prisoners awaiting disciplinary hearings for the most serious misconduct violations classified as "Class I Misconducts".

21. On December 21, 2016, while Kitchen was residing on C-Wing in Unit 1200 in SRF's Level IV division, which is a non-Sanction Wing, he filed an informal complaint against Defendant Morris with SRF's Greivance Coordinator, Russell Vittitow.

22. The complaint pertained to Defendant Morris's refusal to process legal mail and her angry attitude towards SRF's black prisoner population.

23. At all relevant times herein, Defendant Morris was a prison guard acting as a prison counselor in SRf's Unit 1200.

24. While Defendant Morris is a "fair-skinned" black woman, based on the account of witnesses and Kitchen's own observations she presents herself, and therefore tries to pass, as a white woman or identifies more with the white race.

25. Defendant Morris became angry after Kitchen sent her a copy of the informal complaint, and on or about December 21, 2016, sent copies of the complaint to Defendants Winn, Foy, and Russell Vittitow apparently criticizing and complaining about Kitchen and the complaint.

26. On or about December 22, 2016, Defendant Morris then sought authorization from Defendants Winn, Foy, and Culberson to transfer Kitchen from Unit 1200's C-Wing to the Sanction Wing in Unit 600.

27. The request was granted by Defendants Culberson, Winn, and Foy.

28. Defendants Haynes and Chalker directly supervised Unit 600 and its Sanction Wings.

29. As such, Defendant Morris contacted Defendants Haynes and Chalker and asked for their assistance to transfer Kitchen to Unit 600 and placement on its Sanction Wing after receiving authorization to do so from Defendants Culberson, Winn, and Foy.

30. Defendants Haynes and Chalker then aided Defendant Morris transfer Kitchen to Unit 600's Sanction Wing.

31. Kitchen's security and custody level was then effectively increased and he was then transferred to Cell #235 on the Sanction Wing of Unit 600, even though he was not involved in any misconduct, suspected of being involved in misconduct, not serving disciplinary sanctions, or had disciplinary sanctions or a misconduct charge pending.

32. At the time that Defendants Haynes and Chalker aided Defendant Morris transfer Kitchen to Unit 600's Sanction Wing, they knew or reasonably should have known that Kitchen had only filed a complaint against Defendant Morris and had not committed or was not involved in committing any misconduct, was not serving disciplinary sanctions, nor had disciplinary sanctions or a misconduct pending.

33.   As a result of such an increase in custody and security level, Kitchen suffered the deprivations of privileges and increased restrictions as heretofore described in Paragraph 19(a-g).

34.   Defendants Morris, Culberson, Winn, Foy, Haynes, and Chalker foreseen the negative consequences that resulted from Kitchen's transfer to Unit 600's Sanction Wing, since they helped to establish those restrictions and deprivations of privileges or were aware of them in light of their employment in or supervision of SRF's Level IV division and its Sanction Wings.

35.   On December 23, 2016, Kitchen filed grievances against Defendants Morris, Culberson, Winn, Foy, Haynes, and Chalker challenging their decision to transfer him to Unit 600's Sanction Wing.

36.   On December 26, 2016, Kitchen also sent letters to the SRF inspector and the Manager of the MDOC's Internal and Legal Affairs Divisions, Richard Russell, informing them about, among other things, the transfer to Unit 600's Sanction Wing and the belief that it was done in retaliation.

37.   Further stating, on December 26, 2016, Kitchen also sent a kite to Russell Vittitow, SRF's Grievance Coordinator, indicating that prisoner transfers to and off of Unit 600's Sanction Wing may be racially motivated.

38.   Copies of Kitchen's letters to Vittitow and Manager Richard Russell were sent during the morning of December 26, 2016, to Defendants Winn, Foy, and Haynes, who directly supervised Unit 600.

39.   On or about December 24, 2016, Kitchen's mother, Linda J. Williams, called SRF and spoke to Corrections Officer Metts complaining about Kitchen's transfer to Unit 600's Sanction Wing.

40.   Officer Metts misled Kitchen's mother as to Kitchen's status in SRF's Level IV division.

41.  On or about the morning of December 26, 2016, Kitchen's cousin Angela Olivera, also called SRF and complained to staff about Kitchen's placement on Unit 600's Sanction Wing.

42.  Almost immediately after that call, Defendants Karl and Odette, claiming to act on the orders of Defendants Unknown Supervisors or Guards, subjected Kitchen without any legitimate penological objective or justification to a strip search and vandalized property in his cell on the pretext of searching it.

43.  The strip search and property destruction were intended to retaliate against Kitchen because of the complaints from him and his family about the transfer to Unit 600's Sanction Wing.

44.  While in the cell, Defendants Karl and/or Odette strew or haphazardly threw Kitchen's papers, books, family pictures and obituaries, clothing, and other personal effects all over the cell's floor, cell bed, toilet, chair, and the cell's sink, also leaving foot prints and dirt on the clothing and bedding.

45.  During the strip search, Defendants Karl and Odette compelled Kitchen to accompany them to the staff locker room, remove his clothing, and permit them to look at his penis, testicles, rectum, and other body parts without providing a reason.

46.  Defendant Odette stated to Kitchen that he was acting as previously described on the orders of supervisors in SRF's Control Center.

47.  Defendant Karl told Kitchen's cellmate that he and Odette were acting on the orders of Defendants Supervisors or Guards.

48.  Defendants Karl and Odette refused to reveal the names of the supervisors and/or guards whom they claimed were involved.

49. After this incident, Kitchen filed a grievance against Defendants Karl, Odette, and Defendants Unknown Supervisors or Guards and was transferred the next day, on December 27, 2016, to the Sanction Wing in Unit 500.

50. Defendant Haynes initiated or caused the transfer of Kitchen to Unit 500's Sanction Wing with the intent to retaliate against Kitchen because of the grievances filed as previously described about the strip search, property destruction, and the placement on Unit 600's Sanction Wing.

51. When Kitchen was transferred to Unit 500's Sanction Wing, Defendant Haynes knew that Kitchen had not been involved in any misconduct or had sanctions pending, but only filed the complaints as previously described for placement on Unit 600's Sanction Wing, the strip search, and the destruction of property.

52. The deprivations of privileges and increased restrictions that Kitchen suffered as a result of his transfer to Unit 600's Sanction Wing continued following the transfer to Unit 500's Sanction Wing.

53. Defendant Haynes foreseen and intended for Kitchen to suffer the negative consequences that resulted from his transfer to Unit 500's Sanction Wing, since he helped to establish those restrictions and deprivations or were aware of them in light of his employment in or supervision of SRF's Level IV Division codyvs sanction Wings.

54. On December 28, 2016, Kitchen filed a grievance against Defendant Haynes for transferring him to Unit 500's Sanction Wing.

55. Soon after filing the grievance, Defendants Trombley and Glynn vandalized Kitchen's property and forced him to undergo another strip search that was unrelated to any legitimate penological objective or justification.

56. In particular, on January 17, 2017, Defendants Trombley and Glynn ordered Kitchen out of his assigned cell and took him to a janitor closet

- 10 -

where they required him without a legitimate penological objective or explanation to remove his clothing and permit them to look at his penis, testicles, rectum, and other body parts while other prisoners and staff observed from the hallway.

57. Defendants Trombley and Glynn then went through Kitchen's personal property in his assigned cell in Unit 500 and haphazardly threw Kitchen's papers, books, family pictures, clothing, and other personal effects all over the cell's floor, cell bed, toilet, chair, and thee cell's sink.

58. Defendants Trombley and Glynn strip searched Kitchen and vandalized his property in order to retaliate against him because Kitchen filed the previously described complaints and grievances.

59. Defendants Trombley and Glynn stated that they acted on the orders of supervisors and/or guards in SRF's Control Center, but refused to reveal the names of those people.

60. On January 18, 2017, Kitchen filed a grievance against Defendants Trombley and Glynn arguing that the strip search and property destruction was improper and retaliatory.

61. In response, Officer Huizar, another Unit 500 prison guard, ordered Kitchen to submit to a purported cell search on January 23, 2017.

62. When Kitchen asked the purpose for the purported cell search, Officer Huizar refused to respond.

63. On the pretext of conducting a cell search, Officer Huizar then went into Kitchen's assigned cell without any legitimate penological justification or objective and vandalized Kitchen's personal property, including, but not limited too, tearing up personal and legal papers, damaging personal books, and strewing Kitchen's books, legal papers, electronic equipment, clothing, and hygiene items all over the cell's bed, floor, and cell lockers.

- 11 -

64. The personal property of Kitchen's cellmate was not searched.

65. Officer Huizar acted as aforesaid with the intent to retaliate against Kitchen because of the filing of the previously described complaints and grievances against Defendants Trombley, Glynn, Karl, Odette, and Defendants Unknown Supervisors or Guards.

66. On January 23, 2017, Kitchen filed a grievance against Officer Huizar for the vandalization of his property.

67. Almost immediately after filing that grievance, Kitchen's property was again vandalized on February 1, 2017, by Officers Barney and Rozier when, based on the orders, instructions, or directions of unknown supervisors or guards, Officers Barney and Rozier went into Kitchen's assigned cell without any legitimate penological objective or justification and vandalized his personal property by strewing legal papers, clothing, electronic equipment, and other personal effects all over the cell's floor, bed, toilet, and the cell's locker belonging to both Kitchen and his cellmate, and also destroying velcro folders storing legal papers.

68. Kitchen tried speaking to Officer Barney to determine the purpose for the destruction of property, but Barney became uncooperative stating simply that she was ordered to act by unknown supervisors or guards.

69. The actions of Officers Barney and Rozier was intended to retaliate against Kitchen because of the filing of the previously described complaints against Defendants Trombley, Glynn, Karl, Odette, and Officer Huizar.

70. Officer Barney would not reveal the names of the supervisors and/or guards whom she claimed were involved.

## STATEMENT OF CLAIMS

### COUNT I

### RETALIATION

71.   Plaintiff Kitchen re-alleges the allegations in Paragraphs 1-70 as set forth above, and, in particular, those at Paragraphs 21-34.

72.   During this time, Defendants Morris, Winn, Foy, Culberson, Haynes, and Chalker transferred, caused Kitchen to be transferred, or participated in Kitchen's transfer to Unit 600's Sanction wing because of his complaint against Defendant Morris dated December 21, 2016.

73.   As a direct and proximate result of Kitchen's transfer to Unit 600's Sanction wing, Kitchen's custody and security level was increased and he suffered the deprivations and increased restrictions as heretofore described in Paragraphs 19(a-g).

74.   Defendants Morris, Winn, Foy, Culberson, Haynes, and Chalker knew, or should have known, about and, therefore, foreseen the negative consequences that resulted from Kitchen's placement on Unit 600's Sanction Wing.

75.   These Defendants' actions as previously described subjected Kitchen to retaliation for the exercise of his right to free speech in direct violation of the First Amendment to the United States Constitution, as incorporated by the 14th Amendment and enforceable through 42 USC § 1983.

76.   As a direct and proximate result of these Defendants' actions, Kitchen suffered damages without limitation, including, but not limited too, the loss of employment as a housing unit porter, which would have resulted in an income of $420 a year, averaging out to approximately $35 a month. The losses described are permanent or continuing in nature and Kitchen will suffer such losses in the future.

- 13 -

WHEREFORE, Kitchen demands judgment for compensatory damages as described above and punitive damages in the amount of $500 a day, for each day that he was confined on Sanction Wings in Units 500 and 600, to be assessed jointly against Defendant Morris, Culberson, Winn, Foy, Haynes, and Chalker, together with the costs of this action and all other relief recoverable and allowed by law and as this Court deems just.

## COUNT II

### RETALIATION, CRUEL & UNUSUAL
### PUNISHMENT, & SUBSTANTIVE DUE PROCESS VIOLATION

77.  Plaintiff Kitchen re-alleges the allegations in Paragraphs 1-70 as set forth above, and, in particular, those at Paragraphs 41-59.

78.  During the relevant time period, Defendants Karl, Odette, Trombley, Glynn, Haynes, and Unknown Supervisors and/or Guards were all employees of the MDOC and acting under color of state law.

79.  As previously described, Defendants Karl, Odette, Trombley, Glynn, and Unknown Supervisors and/or Guards subjected or caused Kitchen to be subjected to a strip search and vandalized his personal property because of complaints filed by Kitchen and lodged by his family about Kitchen's transfer to the Sanction Wings of Units 500 and 600.

80.  As previously described, Defendant Haynes transferred, caused Kitchen to be transferred, or participated in Kitchens transfer to Unit 500's Sanction Wing because Kitchen filed the grievances as previously described.

81.  As a direct and proximate result of Kitchen's transfer to Unit 500's Sanction Wing, Kitchen's custody and security level was increased and he suffered the deprivations and increased restrictions as heretofore described in Paragraphs 19(a-g), and Defendant Haynes knew, or should have known, about and, therefore, foreseen the negative consequences that resulted from

- 14 -

Kitchen's placement on Unit 500's Sanction Wing.

82.    These Defendants' actions as previously described, taken without any legitimate penological objective or justification simply because of complaints from Kitchen and his family, directly violated the Substantive Due Process Clause of, as well as the 1st and 8th Amendments to, the United States Constitution as incorporated by the 14th Amendment and enforceable through 42 USC § 1983.

83.    As a direct and proximate result of these Defendants' actions, Kitchen suffered damages without limitation.    These losses are permanent or continuing in nature and Kitchen will suffer such losses in the future.

WHEREFORE, Kitchen demands judgment for compensatory and punitive damages in excess of $10,000, exclusive of interest and costs, against Defendants Karl, Odette, Trombley, Glynn, Haynes, and Unknown Supervisors and/or Guards, together with the costs of this action and all other relief recoverable and allowed by law and as this Court deems just.

## COUNT III

### INTENTIONAL INFLICTION OF
### EMOTIONAL DISTRESS CLAIMS AGAINST DEFENDANTS

84.    Plaintiff Kitchen re-alleges the allegations in Paragraph 1-70 as set forth above, and based on such facts Michigan's common law of intentional infliction of emotional distress doctrine will apply to all of the above-named Defendants.

85.    Based on information and belief, this doctrine states that (1) extreme and outrageous conduct (2) that is intentional and reckless (3) that causes or proximately causes the injury complained of and (4) such conduct that subjects a person to severe emotional distress are the elements of intentional infliction of emotional distress.

- 15 -

86.   The above-named Defendants' actions as previously described against Kitchen was extreme and outrageous, intentional and/or reckless, and subjected Kitchen to severe emotional distress.

87.   As a direct and proximate result of these Defendants' actions, Kitchen suffered damages including without limitation pain, suffering, and mental anguish.   The losses described are permanent or continuing in nature and Kitchen will suffer such losses in the future.

WHEREFORE, Kitchen demands judgment for damages in excess of $10,000, exclusive of interest and costs, against the named Defendants, together with the costs of this action and all other relief recoverable and allowed by law and as this Court deems just.

**AFFIDAVIT & VERIFICATION**

Subscribed and sworn to
before me this ___ day
of ___ , 2017.

___
NOTARY PUBLIC

E. WALLACE
Notary Public, State of Michigan
County of Kent
My Commission Expires ___
Acting In the County of ___

Respectfully Submitted,

___
Michael A. Kitchen (#189265)
Proceeding Pro Se
E.C. Brooks Correctional Facility
2500 S. Sheridan Road
Muskegon Heights, Michigan   49444

- 16 -

Michael A. Kitchen (182285)
Earnest C. Brooks Correctional Facility
2500 S. Sheridan
Muskegon Heights, Michigan 49444

5/16/17 RP

RECEIVED
MAY 19 2017
CLERK'S OFFICE
DETROIT

Clerk of The Court
United States District Court
Theodore Levin U.S. Court House
231 W. Lafayette Blvd., Room 564
Detroit, Michigan 48226

# CIVIL COVER SHEET FOR PRISONER CASES

| | | |
|---|---|---|
| **Case No.** 17-11627 | **Judge:** George Caram Steeh | **Magistrate Judge:** Anthony P. Patti |

| **Name of 1st Listed Plaintiff/Petitioner:** | **Name of 1st Listed Defendant/Respondent:** |
|---|---|
| Michael Kitchen | O'Bell T. Winn, et al. |
| **Inmate Number:** 189265 | **Additional Information:** |
| **Plaintiff/Petitioner's Attorney and Address Information:** | |
| **Correctional Facility:**<br>Earnest C. Brooks Correctional Facility<br>2500 S. Sheridan Drive<br>Muskegon Heights, MI 49444<br>MUSKEGON COUNTY | |

**BASIS OF JURISDICTION**
- ☐ **2 U.S. Government Defendant**
- ☒ **3 Federal Question**

**NATURE OF SUIT**
- ☐ **530 Habeas Corpus**
- ☐ **540 Mandamus**
- ☒ **550 Civil Rights**
- ☐ **555 Prison Conditions**

**ORIGIN**
- ☒ **1 Original Proceeding**
- ☐ **5 Transferred from Another District Court**
- ☐ **Other:**

**FEE STATUS**
- ☒ **IFP** *In Forma Pauperis*
- ☐ **PD Paid**

**PURSUANT TO LOCAL RULE 83.11**

1. **Is this a case that has been previously dismissed?**
   - ☐ Yes    ☒ No
   - ➢ If yes, give the following information:
     - Court: _____
     - Case No: _____
     - Judge: _____

2. **Other than stated above, are there any pending or previously discontinued or dismissed companion cases in this or any other court, including state court? (Companion cases are matters in which it appears substantially similar evidence will be offered or the same or related parties are present and the cases arise out of the same transaction or occurrence.)**
   - ☐ Yes    ☒ No
   - ➢ If yes, give the following information:
     - Court: _____
     - Case No: _____
     - Judge: _____