UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL ANDREW
KITCHEN,

              Plaintiff,

v.

O'BELL WINN, *et al.*,

              Defendants.
_____/

Case No. 2:17-cv-11627
District Judge George Caram Steeh
Magistrate Judge Anthony P. Patti

## REPORT AND RECOMMENDATION TO GRANT IN PART AND DENY IN PART THE CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 94 & 96)

**I.     RECOMMENDATION:**  The Court should **GRANT IN PART AND DENY IN PART** the parties' cross-motions for summary judgment.  (ECF Nos. 94 & 96.)

**II.    REPORT:**

    **A.     The operative pleading**

Michael Andrew Kitchen (#189265) is currently incarcerated at the Michigan Department of Corrections (MDOC) Michigan Reformatory (RMI).  *See* www.michigan.gov/corrections, "Offender Search."  On May 19, 2017, while incarcerated at the MDOC's Earnest C. Brooks Correctional Facility (LRF), Plaintiff initiated the instant lawsuit against several named and unnamed officials

1

at the MDOC's Saginaw Correctional Facility (SRF).  (ECF No. 1.)

In January 2019, Plaintiff filed a motion to amend his complaint, which the Court initially granted in part.  (ECF Nos. 45, 57.)  However, on reconsideration, the Court granted Plaintiff's supplemental motion to amend.  (ECF Nos. 60, 82.)  As reflected in the latter of these orders, Plaintiff's April 25, 2019 amended complaint, which names 18 Defendants, is the operative pleading.  (ECF No. 61; *see also* ECF No. 82, PageID.1379.)

### B.    Scheduling Orders and Prior Discovery

On June 24, 2019, the parties stipulated to extend the discovery deadline to July 16, 2019 and the dispositive motion deadline to August 15, 2019.  (ECF No. 74.)  On August 19, 2019, Plaintiff filed a motion for hearing and oral argument on his request for spoliation of evidence sanctions, regarding which I required Defendants to show cause.  (ECF Nos. 79, 84.)  On September 20, 2019, I entered an order denying Plaintiff's motion.  (ECF No. 85.)  Thereafter, Plaintiff filed a reply to Defendants' show cause response (ECF No. 86) and an objection to my order (ECF No. 89), which remains pending before Judge Steeh.

In October 2019, Plaintiff notified the Court of a discovery dispute. (ECF Nos. 92, 93.) However, in November 2019, even though Plaintiff proceeds *in pro per* in this case, Attorney Reynolds A. Brander (P#11128) informed the Court via email that Plaintiff's discovery matter had been resolved.

## C.    Pending Motions

Currently before the Court is Defendants' November 15, 2019 motion for summary judgment. (ECF No. 94; *see also* ECF No. 97.) Of particular note are their arguments that the Court should grant summary judgment in favor of: (1) Defendants Morris (Taylor), Vittitow, Winn, Foy, Culberson, Haynes and Chalker on Plaintiff's First Amendment retaliation claim; and, (2) Defendants Karl, Odette, Trombley, Glynn, Wendt, Massick, Close, Rozier, Smith, Biddle and Huizar on Plaintiff's Cruel and Unusual Punishment claim. (ECF No. 94 PageID.1499, 1501, 1508-1526.)

I entered an order requiring Plaintiff to file a response by December 16, 2019. (ECF No. 95.) Meanwhile, on November 18, 2019, Plaintiff filed his own motion for summary judgment, which consists of a 1-page motion, a combined 25-page motion and brief, and 147 pages of exhibits. (ECF No. 96.) On December 2, 2019, Defendants filed a response. (ECF No. 98.)

Plaintiff's 17-page response to Defendants' dispositive motion, which is accompanied by 82 pages of exhibits, is timely. (ECF No. 100.)

3

### D.     Fed. R. Civ. P. 56

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the case under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party."  *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (internal citations omitted).

"The moving party has the initial burden of proving that no genuine issue of material fact exists . . . ."  *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); cf. Fed. R. Civ. P. 56 (e)(2) (providing that if a party "fails to properly address another party's assertion of fact," then the court may "consider the fact undisputed for the purposes of the motion.").  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'"  *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  The nonmoving party must "make an affirmative showing with proper evidence in order to defeat the motion."  *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *see also*

4

*Metro. Gov't of Nashville & Davidson Cnty.*, 432 F. App'x 435, 441 (6th Cir. 2011) ("The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]here must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute.") (internal quotation marks and citations omitted).

Summary judgment is appropriate if the evidence favoring the nonmoving party is merely colorable or is not significantly probative. *City Management Corp. v. United States Chem. Co.*, 43 F.3d 244, 254 (6th Cir. 1994). In other words, summary judgment is appropriate when "a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case. . . ." *Stansberry*, 651 F.3d at 486 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

The fact that Plaintiff is pro se does not lessen his obligations under Rule 56. Rather, "liberal treatment of pro se pleadings does not require lenient treatment of substantive law." *Durante v. Fairlane Town Ctr.*, 201 F. App'x 338, 344 (6th Cir. 2006). In addition, "[o]nce a case has progressed to the summary judgment stage, . . . 'the liberal pleading standards under *Swierkiewicz* [*v. Sorema N.A.*, 534 U.S. 506, 512-13 (2002)] and [the Federal Rules] are inapplicable.'" *Tucker v. Union of Needletrades, Indus. & Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005)

(quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)).  The Sixth Circuit has made clear that, when opposing summary judgment, a party cannot rely on allegations or denials in unsworn filings and that a party's "status as a pro se litigant does not alter [this] duty on a summary judgment motion."  *Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010); *see also United States v. Brown*, 7 F. App'x 353, 354 (6th Cir. 2001) (affirming grant of summary judgment against a pro se plaintiff because he "failed to present any evidence to defeat the government's motion").

### E.    Discussion

#### 1.    Security Level IV at SRF

The MDOC's prisons "are categorized into different security levels."  *See* www.michigan.gov/corrections, "Prisons," "Prison Directory."  "A Secure Level I facility houses prisoners who are more easily managed within the network (even though they may have committed violent crimes).  The state's Level V prisons house prisoners who pose maximum management problems, are a maximum security risk, or both."  (*Id.*)  Put another way, "Level I is the least secure level and Level V is the most secure."  MDOC PD 05.01.140 ("Prisoner Placement and Transfer") ¶ A, effective Nov. 1, 2017.

SRF – the location at issue in this lawsuit – includes "three Level II buildings, three Level IV buildings, and one Level I building[,] along with

buildings for education, programs, administration, food service, health care and maintenance."  *See* https://www.michigan.gov/corrections/0,4551,7-119-68854_1381_1385-5263--,00.html (last visited July 12, 2020).  According to Plaintiff, SRF's Level IV Division "consists of three housing units, including Units 500, 600, and 1200[.]"  (ECF No. 61, PageID.994 ¶ 11.)

Plaintiff claims to have arrived at SRF on October 7, 2016, at which point he was placed in Housing Unit 1200, which he describes as "a housing unit in SRF's close Security Division in the general prison population."  (*Id*., ¶ 9.)  Plaintiff claims he was placed in that unit "for safety and security concerns[,]" and he sets the stage for his claims by describing the "Sanction Wings."  (ECF No. 61, PageID.994-997 ¶¶ 10, 12-18.)

2.     **Timeline of alleged events at SRF**

a.     **Plaintiff's December 22, 2016 transfer to Unit 600's Sanction Wing**

The facts underlying Plaintiff's verified amended complaint stem from the alleged events of December 21, 2016, when Plaintiff was residing in Unit 1200's C-Wing in SRF's Level IV division – a non-sanction wing – and filed "an informal complaint" against Defendant Morris-Taylor with SRF's Grievance Coordinator, Defendant Vittitow.  (ECF No. 61, PageID.997 ¶ 19.)  The complaint concerned Defendant Morris-Taylor's "refusal to process legal mail and her angry attitude towards SRF's black prisoner population."  (*Id*., ¶¶ 20-22; *see also* ECF No. 94-2.)

7

This angered Defendant Morris-Taylor, and she "sent copies of the complaint to Defendants Winn, Foy, and Vittitow[,] criticizing and complaining about Kitchen and the complaint." (*Id.*, ¶ 23.) By way of a December 21, 2016 email to Vittitow, Morris-Taylor commented upon the complaint, Kitchen's behavior, and, *inter alia*, stated: "Please make note of his name and number for future reference. If at all possible[,] he should not be allowed to use the grievance process for his gratification." (*Id.*, ¶ 24; ECF No. 94-3.) According to Plaintiff, Vittitow did as Morris-Taylor instructed. (*Id.*, ¶ 25.)

On or about December 22, 2016, Culberson, Winn, and Foy granted Morris-Taylor's request to transfer Plaintiff from Unit 1200's C-Wing to Unit 600's Sanction Wing. (ECF No. 61, PageID.998 ¶¶ 26-27.) Defendant Morris-Taylor having asked for their assistance, Haynes and Chalker aided Defendant Morris-Taylor in transferring Plaintiff to Unit 600's Sanction Wing, which effectively increased Plaintiff's security and custody level. (*Id.*, ¶¶ 28-31.) Plaintiff claims that Defendants Haynes and Chalker "knew or reasonably should have known that Kitchen had only filed a complaint against Defendant Morris-Taylor . . . [,]" and that Plaintiff "had not committed or was not involved in committing any misconduct, was not serving disciplinary sanctions, nor had disciplinary sanctions or a misconduct pending." (*Id.*, ¶ 32.) (*See also* ECF No. 61, PageID.999 ¶¶ 33-34.)

On December 23, 2016, Plaintiff initiated grievance SRF-16-12-1948-28B against Morris-Taylor, Culberson, Winn, Foy, Haynes, and Chalker.  (ECF No. 61 ¶ 35.)  As previously discussed by the Court, "SRF-1948 grieves Defendants Morris, Foy, Winn, Culberson, Haynes and Chalker regarding Plaintiff's December 22, 2016 transfer from a Unit 1200 general population cell to 'a more restrictive form of confinement in Unit 600 on the Sanction/Transition Wing,' in retaliation for Plaintiff's December 21, 2016 complaint against Defendant Morris."  (ECF No. 31, PageID.299 (citing ECF No. 25, PageID.221).)

On December 27, 2016, Vittitow responded to the Step I grievance, deeming it vague; the response was reviewed on January 4, 2017 and returned to Plaintiff on January 5.  (ECF No. 25, PageID.221; ECF No. 61, PageID.999 ¶ 36.)  Plaintiff claims this response was pretextual "in order to aid and conspire" with Morris-Taylor as retaliation for filing a complaint against her and "in order to aid" her in prolonging his "unjustified increase in security level and confinement on Unit 600's Sanction Wing as punishment for filing the complaint . . . ."  (ECF No. 61 ¶¶ 37-39.)[1]

### b.  December 26, 2016 searches by Odette and Karl

---

[1] Winn's response to the Step II grievance appeal is dated January 30, 2017 (ECF No. 25, PageID.220), but it does not appear to be a basis of Plaintiff's complaint against Winn.

From December 24 to December 26, 2016, Plaintiff and his family members made various complaints about Plaintiff's transfer to Unit 600's Sanctions Wing. (ECF No. 61, PageID. 1000 ¶¶ 40, 42-45.)  Plaintiff's mother and cousin have executed affidavits about their phone calls to SRF.  (ECF No. 52, PageID.744-746 [Williams Affid.], ECF No. 52, PageID.747-749 [Olivera Affid.].)  On December 26, 2016, Plaintiff wrote to Foy, Haynes, and the SRF Inspector about "life threatening conditions," asking them to be mindful of where he is moved or transferred and with whom he is housed.  (ECF No. 52, PageID.741.)  The same day, he wrote to Richard Russell of MDOC's Office of Legal Affairs about "retaliatory transfers," allegedly including a copy of his same-day kite.  (ECF No. 52, PageID.743.)  Also, Kitchen "sent a kite to Defendant Vittitow indicating that prisoner transfers to and off of Unit 600's Sanction Wing may be racially motivated."  (*Id.*, ¶ 41.)

On December 26, 2016, Plaintiff was subjected to a search of his cell and a strip search in the staff locker room.  (ECF No. 61, PageID.1000-1001 ¶¶ 46-51.)  The 5:15 p.m. SRF 600 Wing Logbook entry states, "permission obtained from Sgt. Biddle to conduct strip search . . . for possible contraband."  (ECF No. 94-8.)  According to the SRF "nonroutine unclothed prisoner search" form, Defendants Odette and Karl performed the search for "possible contraband," but none was found.  (ECF No. 94-7, PageID.1564.)  Plaintiff's cellmate, Tommie Flowers

10

(#213557), attests that his property "had been moved around but not really searched[,]" while Plaintiff's property "was strewn all over the cell and his assigned bed." (ECF No. 52, PageID.750-752.)

Plaintiff claims that the strip search and cell search were done to retaliate against Plaintiff for his and his family's complaints about his transfer to Unit 600's Sanction Wing. (*Id.*, ¶¶ 52-53.) He promptly initiated SRF-16-12-1954-17B, and he "informed Defendants Karl and Odette that the matter would be grieved." (ECF No. 25, PageID.208; ECF No. 61, PageID.1002 ¶ 54; *see also* ECF Nos. 94-17, 98-4.)

In early January 2017, perhaps to inform the grievance investigation, Odette and Karl each wrote a memorandum to Sgt. Wendt. (ECF No. 94-7, PageID.1565-1566; ECF No. 52-1, PageID.818, 824.) Wendt's Step I response is dated January 30, 2017, and Winn's Step II response is dated February 27, 2017. (ECF No. 25, PageID.207, 209.)

### c.    December 27, 2016 transfer to Unit 500

On December 27, 2016, Defendant Haynes and/or Chalker "initiated or caused Kitchen to be transferred to Unit 500's Sanction Wing . . . ." (ECF No. 61, PageID.1002 ¶ 55.) Plaintiff claims this transfer was done in retaliation for Plaintiff's aforementioned grievances about the strip and cell searches, the destruction of his property, and his placement on Unit 600's Sanction Wing. (*Id.*,

¶¶ 56-57.)  According to Plaintiff, transfer to Unit 500's Sanction Wing brings with it "[t]he deprivations of privileges and increased restrictions that [he] suffered as a result of his transfer to Unit 600's Sanction Wing . . . ."  (*Id.*, PageID.1002-1003 ¶¶ 58-59.)

On December 28, 2016, Plaintiff initiated SRF-16-12-1962-28B, which grieves Defendants Haynes and "currently unknown supervisors guards" regarding his December 27, 2016 transfer from Unit 600 to Unit 500, which Plaintiff suggests was in retaliation for his December 26, 2016 complaints.  (ECF No. 25, PageID.218; ECF No. 61, PageID.1003 ¶ 60; *see also* ECF Nos. 94-17, 98-4.)

### d.    January 17, 2017 searches by Trombley and Glynn

On January 17, 2017, Trombley performed a non-routine unclothed prisoner search for possible contraband, which appears to have been authorized by Massick (and allegedly Close), but none was found.  (ECF No. 94-13; ECF No. 61, ¶ 61.)  Plaintiff claims that Defendants Trombley and Glynn took him to a janitor closet and forced him to undergo a strip search "while other pri[so]ners and staff observed from the hallway."  (ECF No. 61, PageID.1003 ¶¶ 61-62.)  Trombley and Glynn then searched Plaintiff's personal belongings, which "resulted in the vandalization of Kitchen's property . . . ."  (*Id.*, PageID.1003-1004 ¶¶ 63, 65.)

Plaintiff alleges that the strip and cell searches were Massick, Close, Trombley and Glynn's retaliation for Plaintiff's grievances regarding his transfer

12

to Unit 600's Sanction Wing (SRF-1948), his transfer to Unit 500's Sanction Wing (SRF-1962), and the previously conducted cell and strip searches (SRF-1954). (ECF No. 61, PageID.1004 ¶ 64.).  On January 18, 2017, Plaintiff initiated SRF-17-01-0097-28B, which grieves Defendants Trombley, Glynn and "Unknown MDOC Supervisors, Officers, or Employees" regarding the January 17, 2017 strip search and cell/bed search.  (ECF No. 25, PageID.215; ECF No. 61, PageID.1004 ¶ 66; *see also* ECF Nos. 94-17, 98-4.)

### e.    January 23, 2017 cell search by Defendant Huizar

On or about January 23, 2017, Defendant Huizar "ordered Kitchen to submit to another cell search . . . [,]" but, when Kitchen inquired about the search's purpose, "Defendant Huizar refused to respond."  (ECF No. 61, PageID.1004 ¶¶ 67-68.)  Huizar, in essence, vandalized Plaintiff's property.  (*Id*., ¶¶ 69-71.)  This was done to retaliate against Plaintiff for filing the above-described complaints regarding his transfers to the Unit 600 and Unit 500 Sanction Wings and the subsequent strip and cell searches.  (*Id*., ¶ 72.)

On January 23, 2017, Plaintiff initiated SRF-17-01-0124-17G against Huizar and others.  (ECF No. 25, PageID.195; ECF No. 61, PageID.1005 ¶ 73; *see also* ECF Nos. 94-17, 98-4.)  On February 3, 2017, Plaintiff's cellmate, Breyan Fuqua (#876674), executed an affidavit regarding the January 18th, January 23rd, and February 1st searches.  (ECF No. 52, PageID.763-767.)  By a February 10, 2017

13

memorandum to the Grievance Coordinator, Huizar claimed that "[a]t no time did [he] vandalize [Plaintiff's] property . . . [;]" he "searched the cell for contraband and returned it to its original state to the best of [his] abilities." (ECF No. 52-1, PageID.842.) Huizar also claimed to have searched both Plaintiff's and inmate Fuqua's property. (*Id*.) RUM Culberson's Step I response is dated February 13, 2017, and Warden Winn's Step II response is dated March 20, 2017. (ECF No. 25, PageID.192-196).

### f.    The February 1, 2017 cell search by non-party Barney and Defendant Rozier

Shortly after Plaintiff filed SRF-0124, non-party Barney and Defendant Rozier "went into Kitchen's assigned cell and went through his personal property, legal papers, clothing, electronic equipment, and other personal effects." (ECF No. 61, PageID.1005 ¶ 74.) This resulted in the vandalization of his personal property. (*Id*., PageID.1005-1006 ¶ 75.) Plaintiff claims this search was intended to retaliate against him for filing the above-described complaints regarding his transfers to the Unit 600 and Unit 500 Sanctions Wings and the above-described strip and cell searches. (*Id*., PageID.1006 ¶¶ 76-77.)

On February 2, 2017, Plaintiff initiated SRF-2017-02-0165-17g against Barney, Rozier and others. (ECF No. 98-4, PageID.1908.) By a memorandum to Lieutenant Price dated February 8, 2017, Corrections Officer Rozier averred that he did not destroy Plaintiff's room, performed a routine cell search, and "tried to

return the cell as close to its original condition as [he] could."  (ECF No. 52-1, PageID.844.)  Rozier also noted that Barney and Enzser (non-parties) "went to view the room and stated it was in acceptable condition."  (*Id*.)

### 3.    Count I (against Morris-Taylor, Vittitow, Winn, Foy, Culberson, Haynes and Chalker) is based on transfers.

As discussed above, Plaintiff's complaint is based in part upon two transfers – the December 22, 2016 transfer to Unit 600 (ECF No. 61, ¶¶ 19-39) and December 27, 2016 transfer to Unit 500 (¶¶ 55-60).  His first cause of action for First Amendment retaliation against seven Defendants is based on their involvement in his transfers to and prolonged confinement in Unit 500's and Unit 600's Sanctions Wings.  (ECF No. 61 ¶¶ 78-83.)  "A retaliation claim essentially entails three elements:

(1)    the plaintiff engaged in protected conduct;

(2)    an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and

(3)    there is a causal connection between elements one and two— that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).[2]

---

[2] Defendants take issue with Plaintiff referring to his December 21, 2016 kite as a "filed complaint" and contend that "[a] kite does not constitute a complaint against Defendant Morris under MDOC policy[,]" *i.e.*, Plaintiff "did not file a grievance." (ECF No. 98, PageID.1866; ECF No. 94, PageID.1519.)  Nonetheless, Defendants

### a.      Adverse action

As noted above, Plaintiff spends several paragraphs of his complaint

describing the "Sanction Wings."  (ECF No. 61, PageID.994-997 ¶¶ 10, 12-18.)

Among other things, Plaintiff alleges that prisoners confined on these wings "do

not have access to the same privileges as those in the general prison population, in

that privileges . . . are severely restricted and prisoners on Unit 600's Sanction

wing suffer the most extreme restriction of these privileges."  (*Id*., ¶ 16.)

Defendants contend that "the transfer to unit 600 was not adverse[,]"

because Plaintiff "remained at a level IV security level[,]" and "he has not

provided evidence of how everyday life in those wings differs, if any, from general

population."  (ECF No. 94, PageID.1509, 1511; *see also* ECF No. 98,

PageID.1873-1875.)

However, Plaintiff is not arguing that he has a "right to be housed in a

particular unit and to receive particular privileges."  (ECF No. 94, PageID.1511.)

Instead, he alleges that transfer to the Unit 600 or Unit 500 Sanction Wings

resulted in "deprivations of privileges and increased restrictions . . . [,]" or, in other

words, "negative consequences."  (ECF No. 61, PageID.1002-1003 ¶¶ 58-59; ECF

No. 96, PageID.1695.)  *See Hill v. Lappin*, 630 F.3d 468, 475 (6th Cir. 2010) ("The

McCreary staff's threat and recommendation in the present case to transfer Hill to

---

do not seem to challenge treatment of this kite as protected conduct.

the lock-down unit at Lewisburg constitutes an adverse action because the transfer would foreseeably lead to a living environment with more restrictions and fewer privileges than in the prison's general population."). *See also Thaddeus-X*, 175 F.3d at 398 ("Harassment, physical threats, and transfer to the area of the prison used to house mentally disturbed inmates, especially combined with the conditions allegedly present there, would likely have a strong deterrent effect."); *Brown v. Crowley*, 312 F.3d 782, 789 (6th Cir. 2002) ("placing a prisoner in administrative segregation is an adverse action.") (citations omitted).

As for evidence, while it is true that general population prisoners "shall be afforded the opportunity for at least one hour per day indoor or outdoor recreation (i.e., yard), unless restricted for medical or security reasons," MDOC PD 03.03.130 ¶ F, eff. Feb. 23, 2009 (ECF No. 94-15), even Defendants acknowledge that when an inmate is temporarily transferred to the sanction wing for a reason other than sanctions, such as safety or a request to be moved, they still receive "all mandatory rights," but "only lose access to privileges such as the access to the big yard or the day room *for more than one hour*, ping pong tables and TVs." (ECF No. 94, PageID.1506-1507 (emphases added).

Moreover, when arguing that his transfer to Unit 600 constituted adverse action, Plaintiff points to his verified operative pleading, which describes restrictions categorized by disciplinary reviews, release from sanction wing,

17

exercise yard, showers, facility programs & activities, facility dining hall, and pillow (ECF No. 61, ¶ 17) and his September 24, 2019 affidavit, within which he describes the restrictions he encountered when assigned to the Sanction Wings in Units 600 and 500 (ECF No. 96, PageID.1706-1716 ¶¶ 15, 26).  (*See* ECF No. 100, PageID.1924-1925.)  Additionally, the Court notes that the January 25, 2017 affidavit of Dana Miles (#825601) contrasts confinement in Unit 1200 with confinement in Unit 600's sanctions wing.  (ECF No. 96, PageID.1823-1834 ¶¶ 8-13.)[3]

### b.    Causal connection

### i.    Temporal proximity

Defendants assert that Plaintiff "has nothing but conclusory assertions or personal beliefs to support his claims of retaliation[,]" and "relies on temporal proximity to establish this retaliation claim."  (ECF No. 94, PageID.1517-1520.)  Even if "the temporal proximity between [Plaintiff] filing his grievances and the decision to transfer him provides some circumstantial support for a causal connection[,]" the Sixth Circuit has noted that "this evidence alone is not sufficient to meet [Plaintiff]'s burden to show that the filing of grievances was a substantial

---

[3] If, as Plaintiff attests, the privileged and increased sanctions on Unit 600's Sanction Wing are consistent with those on Unit 500's Sanction Wing (ECF No. 96, PageID.1713 ¶ 26), one could argue that the December 27, 2020 transfer between these units was not adverse.  Yet, it is important to note Plaintiff's claims that his time in the Sanction Wings was "prolonged."  (ECF No. 61, ¶¶ 78-83.)

or motivating factor for his transfer." *Smith v. Campbell*, 250 F.3d 1032, 1038 (6th

Cir. 2001). *See also Hill*, 630 F.3d at 476 ("Although this court has concluded that

evidence of temporal proximity between filing grievances and the adverse action

provides some support for establishing retaliatory motive, it has been reluctant to

find that such evidence alone establishes retaliatory motive.") (citing *Holzemer v.

City of Memphis*, 621 F.3d 512, 526 (6th Cir. 2010)).

From October 2016 – when Plaintiff claims to have arrived at SRF – to

February 2017, he initiated nineteen grievances at SRF, including the six discussed

above (SRF-1948, SRF-1954, SRF-1962, SRF-0097, SRF-0124 and SRF-0165).

(ECF No. 94-17; ECF No. 61, PageID.994 ¶ 9.)  To the extent Plaintiff relies

solely on temporal proximity to establish the causal connection, Defendants

correctly note that "[w]here a prisoner is a 'prolific filer of grievances[,]' there

would almost always be a temporal proximity between one event and the other."

(ECF No. 94, PageID.1519.)  In other words, "the inference of retaliation based on

temporal proximity is weakened by Plaintiff's frequent filing of grievances."  (*Id.*)

*See Coleman v. Bowerman*, 474 F. App'x 435, 438 (6th Cir. 2012) ("temporal

proximity alone is insufficient to show a causal connection in this case because

Coleman has presented no other proof of retaliatory motive.  This is especially true

in light of Coleman's grievance history, because any attempt at enforcing prison

regulations would likely be in 'close temporal proximity' to one of Coleman's

19

many grievances or grievance interviews."). (*See also* ECF No. 98, PageID.1862-1864.)

However, Plaintiff draws the Court's attention to the timing of these grievances. (*See* ECF No. 100, PageID.1929.) SRF-1948 (SRF-1949), SRF-1954, and SRF-1962 were each received at Step I within a two-day period – December 27-29, 2016 – and these were Plaintiff's second through fifth grievances at SRF during 2016, with the first being SRF-2016-10-1666-12G (which Plaintiff contends was against an optometrist). (ECF No. 94-17.) This cuts against Defendants' argument that Plaintiff's December 22 and December 27, 2016 transfers are coincidental to his numerous grievances.

### ii.     Other indicia

In his own motion for summary judgment, Plaintiff contends that he is relying upon more than just the temporal proximity between his kites, complaints or grievances and his December 22, 2016 or December 27, 2016 transfers. (ECF No. 96, PageID.1696-1698.) He explains that, "when the grievances are put into context, the retaliatory intent behind the Defendants' actions become[s] apparent." (ECF No. 100, PageID.1929.)

**(a)**     Defendants argue that Morris had a "penological reason for transferring Plaintiff[,]" *i.e.*, "it was not because of his kite, but because he asked to be moved." (ECF No. 94, PageID.1512.) At her deposition, Morris testified

that she did not recall receiving the December 21, 2016 kite but admitted that it was her handwriting on the kite.  (ECF No. 98-2, PageID.1888-1889 [pp. 5-6].)  She also testified that, according to her typewritten notes, "[t]his move occurred due to Kitchen sending me several kites saying that I was incompetent to help him with his needs.  He stated that he wanted to be moved and he wanted another counselor to handle all of his concerns and not me."  (*Id*., PageID.1891.)  Morris makes a similar statement in her July 20, 2017 memorandum to Administrative Assistant Walker, seemingly in response to ¶ 26 of Plaintiff's original complaint.  (ECF No. 1, ¶ 26; ECF No. 52-1, PageID.795-796.)

However, while Plaintiff authored the December 21, 2016 kite about Morris and addressed it to Vittitow, but allegedly placed it into Morris's mailbox (ECF No. 94, PageID.1511), Plaintiff does not asked to be moved; instead, he stated:  "I would appreciate it if you can speak to staff and see if we can submit our legal mail to the resident unit manager [RUM] or a counselor in another unit when ARUS Novak is absent."  (ECF No. 94-2.)  In fact, Plaintiff attests that "I did not nor have I ever made a request to either Morris or any other SRF staff member to transfer me to another cell, housing unit, or to any other place."  (ECF No. 96, PageID.1709 ¶ 9.)  Adding to the question of fact over the reason for Plaintiff's transfer are:

- Morris's December 21, 2016 email to Vittitow, which states, "he's attempting to fabricate false accusations against me[,]" or

"putting his memo in my kite box . . . was his way of trying to intimidate me." (ECF No. 94-3.)

- Plaintiff's affidavit, which reflects that, on the day of his transfer from Unit 1200 to Unit 600, he tried talking to Morris, she refused to talk to him, she said that if he had a problem he could take it up with the RUM or the Warden (i.e., Culberson or Winn), and, when Plaintiff inquired about their knowledge of his transfer, "she appeared to respond in the affirmative . . . ." (ECF No. 96, PageID.1709-1710 ¶¶ 11-13.)

- The January 25, 2017 affidavit of Dana Miles (#825601), who describes his complaints and/or kites – about Morris or to her – that were followed by his December 2016 transfer to Unit 600's Sanction Wing and his January 2017 transfer to Unit 500's Sanction Wing. (ECF No. 96, PageID.1824-1827 ¶¶ 2-8, 14).

Moreover, on the issue of available bed space, Plaintiff references the Housing Unit 600 Logbook Record (ECF No. 100, PageID.1946), the December 26, 2016 Housing Unit 500 Occupied Locks Report (ECF No. 100, PageID.1947-1953), Defendants' discovery response that "Unit 600 has a total of 120 cells and Unit 500 has a total of 96 cells[,]" (ECF No. 100, PageID.1958), and his affidavit (ECF No. 96, PageID.1710 ¶ 14). (ECF No. 100, PageID.1925.) Plaintiff has pointed to sufficient evidence to create a "genuine dispute" that Morris-Taylor had retaliatory motive when transferring Plaintiff to Unit 600's Sanction Wing on December 22, 2016, the consequences of which were allegedly continued with Plaintiff's December 27, 2016 transfer to Unit 500's Sanction Wing. Fed. R. Civ. P. 56(a).

**(b)** Defendants argue that Winn, Culberson, and Foy did not have knowledge of Plaintiff's complaint against Morris-Taylor. (ECF No. 94,

22

PageID.1512-1513; *see also* ECF No. 98, PageID.1867-1869.)  Defendants Culberson and Foy each attest that they "have no knowledge of a complaint[/grievance] against PC Morris."  (ECF No. 94-25, PageID.1654 ¶ 3; ECF No. 94-26, PageID.1657 ¶ 4.)  Similarly, Winn did not recall the December 21, 2016 kite and explained that he has staff that goes through his "stuff," and, if it is not something that he handles, "would have redirected to a staff member who actually would handle it[.]"  (ECF No. 96-1, PageID.1821 [pp. 39-40]; ECF No. 94-14, PageID.1595 [p. 40].)  Also, seemingly with reference to how Plaintiff's December 21, 2016 complaint was handled, Winn testified, "I'm unaware of that."  (*Id.*)

Yet, Defendant Morris-Taylor's handwritten notes state that she sent a copy of Plaintiff's December 21, 2016 complaint to the grievance coordinator, deputy warden (allegedly Foy), and warden (allegedly Winn).  (ECF No. 94-2, ECF No. 61, ¶ 5.)  At her deposition, when Morris-Taylor was asked "[w]hich deputy warden did you send it to[,]" she answered, "It's been so long, I couldn't even tell you."  (ECF No. 98-2, PageID.1889 [p. 6].)  She also did not recall her reason for sending a copy of the kite to the grievance coordinator.  (*Id.*, PageID.1889-1890 [pp. 6-7].)  Likewise, when asked about confronting RUM Culberson before Plaintiff was moved, Morris-Taylor answered, "No.  I don't consult with my supervisor about moves."  (ECF No. 94-4, PageID.1544 [p. 37].)  Winn agreed that

"a prisoner counselor can initiate a move without anybody else's approval[.]"
(ECF No. 94-14, PageID.1596.)  Thus, while Morris-Taylor does not deny sending
a copy of the complaint to Foy or Winn, Morris-Taylor denies consulting with
Culberson before Plaintiff's transfer and Winn confirms that Culberson need not
have done so.[4]

Even if Winn, Culberson and Foy had knowledge of the kite, "liability must
be based upon active unconstitutional behavior."  *Bass v. Robinson*, 167 F.3d 1041,
1048 (6th Cir. 1999) (citing *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1246 (6th
Cir. 1989)).  In his motion, Plaintiff contends that Winn, Culberson, and Foy's
"failed memories" – which he doubts – means that they "cannot offer any
testimony or evidence in dispute of [his] allegations . . . [,]" and, therefore, he "is
entitled to summary judgment against them . . . ."  (ECF No. 96, PageID.1698.)
This is an inaccurate interpretation of the Rule 56 standard.  More to the point, in
his response brief, Plaintiff asserts that Winn and Foy do not deny receiving the
kite or taking part in the transfer, and Plaintiff particularly takes issue with Foy's
attestation that he "was off on medical leave starting [December 20, 2016][,]"
(ECF No. 94-26, PageID.1657 ¶ 2), noting that Foy did not provide the date of his

---

[4] During discovery, Plaintiff asked Culberson to admit that she "authorized,
approved of, or knowingly [acquiesced] in" Plaintiff's transfers from Unit 1200 to
Unit 600 or from Unit 600 to Unit 500.  In each case, she responded:  "I can
neither admit nor deny the truth of this statement.  To the extent that a response is
necessary, denied, and Plaintiff is left to his proofs."  (ECF No. 52, PageID.726.)

return.  (ECF No. 100, PageID.1927.)

Notwithstanding Plaintiff's arguments, the Court has no reason to believe

that Foy returned before either Plaintiff's December 22nd or December 27th transfer

or that Winn, Culberson or Foy played an "active" roll in either of these transfers.

*Bass*, 167 F.3d at 1048.  Thus, even if these Defendants knew about Plaintiff's kite,

it requires "a large logistical leap" to conclude that they retaliated against him by

transferring him from Unit 1200 to Unit 600 or from Unit 600 to Unit 500.  (ECF

No. 94, PageID.1513-1514; *see also* ECF No. 98, PageID.1869-1870.)  In other

words, even if Winn, Culberson, or Foy knew of Plaintiff's complaint, Plaintiff has

not created a "genuine dispute" that any of these Defendants actively participated

in the transfers.  Fed. R. Civ. P. 56(a)

(c)     As for Vittitow, to whom Plaintiff's December 21, 2016 complaint

was addressed (ECF No. 94-2), to whom Morris wrote her same-day email (ECF

No. 94-3), and who provided the alleged improper Step I response to SRF-1948

(ECF No. 61, ¶¶ 36-39), Defendants correctly note that, where a Defendant's "only

role[] . . . involve[s] the denial of administrative grievances or the failure to act[,]"

he or she "cannot be liable under § 1983."  *Shehee v. Luttrell*, 199 F.3d 295, 300

(6th Cir. 1999).  (ECF No. 94, PageID.1515-1516.)

To be sure, when analyzing exhaustion of administrative remedies, I

previously noted my disagreement with the MDOC's characterization of SRF-1948

as vague.  (*See* ECF No. 31, PageID.300-303.)  Nevertheless, as Defendants

explain, what is meaningful here is "what Defendant Vittitow's *reason* was for the

rejection in 2017."  (ECF No. 94, PageID.1516-1517 (emphasis added).)

Plaintiff contends that Vittitow improperly rejected SRF-1948 "in order to

aid Defendant Morris."  (ECF No. 96, PageID.1698.)  Plaintiff further contends

that Vittitow's involvement "was far greater than the defendants in *Shehee* . . . [,]"

and he asks the Court to focus on Vittitow's receipt of Morris's December 21,

2016 email – including her statement that "[i]f at all possible he should not be

allowed to use the grievance process for his gratification[,]" (ECF No. 94-3) – and

Vittitow's subsequent, December 27, 2016 pretextual rejection of SRF-1948 as

"vague and not in compliance with MDOC policy."  (ECF No. 100, PageID.1928;

ECF No. 25, PageID.221.)  Although the kite did not occur "weeks earlier," and

while Plaintiff's suggested connection might not be "preposterous," (ECF No. 94,

PageID.1516-1517), there is no evidence that Vittitow rejected SRF-1948 "for the

sole purpose of shielding the actions of Morris from supervisor review and

prolonging his confinement on the Sanction Wing in order to aid Morris[']

retaliat[ion] against him."  (ECF No. 100, PageID.1928.)

However, Plaintiff is not required to prove that the "sole purpose" of

Vittitow's action was to thwart or punish Plaintiff's protected conduct.  Plaintiff

meets his burden by "establishing that his protected conduct was a *motivating*

26

*factor* behind any harm[.]" *Thaddeus-X*, 175 F.3d at 399 (emphasis added) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274 (1977).) Then, "the burden of production shifts to the defendant." (*Id*.) "If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Thaddeus-X*, 175 F.3d at 399.

Defendants note that Plaintiff submitted nineteen grievances at SRF in the four-month period from October – February 21st (ECF No. 94-17, PageID.1622-1623). (ECF No. 98, PageID.1870.)[5] Moreover, Defendants contend that Vittitow "accepted 5 grievances related to this [complaint] alone[,]" presumably the grievances referenced in the above timeline (SRF-1948 (SRF-1949), SRF-1954, SRF-1962, SRF-0097, SRF-0124, and/or SRF-0165). (*Id*., citing ECF No. 61, PageID.994-1006.) Defendants take the position that, "[i]f Defendant Vitittow ha[d] intensions of shielding any government actors, he would have rejected more than one single grievance." (ECF No. 98, PageID.1871.)

But the Court is somewhat perplexed by this position, because, of the four

---

[5] Defendants also contend that Plaintiff "successfully filed 8 grievances within approximately 6 weeks of the start of this claim." (ECF No. 98, PageID.1870.) However, comparing the grievances to which Defendants refer (ECF No. 98-4, PageID.1902-1909) with the Prisoner Grievance Summary Report (ECF No. 94-17), Defendants seem to be referring to the eight grievances received at Step I from December 28th – February 21st that were also pursued through Steps II and III.

grievances that were received at Step I within the relevant two-day period (December 27-29, 2016), Wendt provided a substantive response to SRF-1954, while Vittitow "deemed vague and rejected" SRF-1948, SRF-1949, and SRF-1962. (*Compare* ECF No. 25, PageID.208-209, *with* ECF No. 25, PageID.218, 221, 224.) Moreover, Vittitow provided a somewhat similar response in January 2017 to SRF-0097.  (ECF No. 25, PageID.215.)  This challenges Defendants' suggestion that if Vittitow "imposed the rejection to shield Morris's behavior from supervisor review and to help her confine Kitchen to the Sanction Wings[,]" (ECF No. 96, PageID.1698), then "he would have rejected more than one single grievance." (ECF No. 98, PageID.1870-1872.)  Defendant Vittitow has failed to establish the lack of a genuinely disputed fact question, and Plaintiff has satisfied the Undersigned that material facts remain in dispute as to Vittitow's *reason* for rejecting SRF-1948.  Fed. R. Civ. P. 56(a).

**(d)**    Plaintiff claims that Chalker and Haynes responded to Morris-Taylor's request for assistance by aiding Morris-Taylor with Kitchen's December 22, 2016 transfer to Unit 600's Sanction Wing (ECF No. 61, ¶¶ 28-35) and initiated or caused Plaintiff's December 27, 2016 transfer to Unit 500's Sanction Wing (ECF No. 61, ¶¶ 55-60).  Defendants argue that Chalker and Haynes were not personally involved in Plaintiff's transfer; rather, "they simply were stationed in unit 600 at the time of Plaintiff's transfer."  (ECF No. 94, PageID.1514-1515;

28

*see also* ECF No. 98, PageID.1876-1877 [Defendants' Response]; ECF No. 52, PageID.705 [Winn Dep. Test. p. 32].)

Chalker and Haynes each attest that they "have no knowledge of a complaint/grievance against PC Morris." (ECF No. 94-10 ¶ 8, ECF No. 94-23 ¶ 8.) Even so, Chalker and Haynes may somehow have been involved in *executing* the transfer(s). In response to requests for admissions that concerned contacting Chalker and Haynes on December 22, 2016, Morris states that she "spoke to whatever counselor was working that unit that day." (ECF No. 52, PageID.716.) Similarly, at her deposition, Morris could not recall to whom she spoke about Plaintiff's transfer. (ECF No. 94-4, PageID.1544 [p. 37].) Also, Haynes admitted that he "assisted Defendant Morris to transfer or move Plaintiff Kitchen from Unit 1200 to Unit 600 on or about [December 22, 2016]," although Chalker was less clear in his response to the same request for admission. (ECF No. 52, PageID.723, 721.)

Plaintiff focuses on Morris's and Winn's depositions, Haynes and Chalker's responses to requests for admission, and Haynes and Chalker's affidavits. (ECF No. 100, PageID.1927-1928.) However, even if Haynes and Chalker admit that they did supervise or aid in Unit 600's operation (ECF No. 52, PageID.720, 722), and even if their affidavits do not deny "helping with the transfer . . . [,]" or even if they do not attest that Plaintiff "was placed on the Sanction Wing because there

29

were no available beds," (ECF No. 100, PageID.1928), this does not create a

"genuine dispute" that Haynes and Chalker had retaliatory motive when

participating in the transfers.  Fed. R. Civ. P. 56(a).[6]

> **4.    Count II (against Karl, Odette, Trombley, Glynn, Smith, Biddle, Wendt, Massick, Close, Rozier, and Huizar) is based on searches.**

Plaintiff's second cause of action alleges violations of the First, Fourth,

Eighth, and Fourteenth Amendments by eleven Defendants based on the strip and

cell searches.  (ECF No. 61 ¶¶ 84-88.)  To summarize the allegations against these

individuals, Karl and/or Odette performed the December 26, 2016 searches, which

Smith, Biddle and/or Wendt ordered, approved, authorized, etc. (*id.*, ¶¶ 40-54);

Trombley and/or Glynn performed the January 17, 2017 searches, which Massick

and/or Close ordered, approved, authorized, etc. (*id.*, ¶¶ 61-66); Huizar performed

the January 23, 2017 cell search (*id.*, ¶¶ 67-73); and, Rozier – as well as a non-

party – performed the February 1, 2017 cell search (*id.*, ¶¶ 74-77).

> **a.    Whether the strip and cell searches violated the First and/or Eighth Amendments?**

---

[6] As Plaintiff did with regard to Winn, Culberson, and Foy, Plaintiff contends that Chalker and Haynes's "failed memories" – which he doubts – means that they "cannot offer any testimony or evidence in dispute of [his] allegations . . . [,]" and, therefore, he "is entitled to summary judgment against them . . . ."  (ECF No. 96, PageID.1698)  As noted before, this is an inaccurate interpretation of the summary judgment standard.  A party's failure to remember certain events does not necessarily mean that an adversary's characterization of those events must be true.

Defendants narrowly and expressly frame Plaintiff's search-related claims as based on the Eighth Amendment's ban on cruel and unusual punishment; yet, they substantively seem to recognize that the search-related cause of action is also based on the First Amendment's protection of "the freedom of speech," or, more pertinently here, Plaintiff's right to be free from retaliation for "petition[ing] the Government for a redress of grievances."  U.S. Const. amend. I.   (*Compare* ECF No. 61, ¶ 87, *with* ECF No. 94, PageID.1520-1526.)

### i. Strip searches and treatment of Plaintiff's property (adverse actions)

A strip search may constitute adverse action.  *Campbell v. Mack*, 777 F. App'x 122, 135 (6th Cir. 2019) (Plaintiff presented evidence of "invasive strip and/or body cavity searches," which were conducted "in an overly aggressive manner[.]").  There is no dispute that Plaintiff was strip searched on December 26th and January 17th (ECF Nos. 94-7, 94-13), and Plaintiff attests that these searches involved Odette, Karl, Trombley and/or Glynn to look at Plaintiff's "penis, testicles, rectum, and other body parts . . . [,]" (ECF No. 96, PageID.1712 ¶ 20, 1714 ¶ 30.)  Even if the intrusions were found to be necessary, they may well have been degrading or upsetting.[7]

---

[7] *See also*, *e.g.*, *Harris v. Rocchio*, 132 F.3d 42 (10th Cir. 1997) (acknowledging that "prison guards should use strip searches as a last resort because of their invasive and degrading nature," although ultimately finding the strip search reasonable under the Fourth Amendment); *Smook v. Minnehaha Cty.*, 457 F.3d

Plaintiff alleges that the cell searches resulted in the disarray, destruction and/or vandalization of his property.  (*Id.*, ¶¶ 49, 56-57, 65, 71, 75-76.)  These allegations are disputed.  Defendants contend that they "did not vandalize any of [Plaintiff's] property[,]" (ECF No. 98, PageID.1879), in support of which they cite, *inter alia*, affidavits from Karl (ECF No. 94-11), Odette (ECF No. 94-18), Trombley (ECF No. 94-19), Glynn (ECF No. 94-20), Huizar (ECF No. 94-22) and Rozier (ECF No. 94-21).  Huizar and Rozier also address the post-search state of Plaintiff's cell in separate MDOC Memoranda – the former's regarding SRF-0124 (the January 23rd cell search) and the latter's regarding SRF-0165 (the February 1st cell search).  (ECF No. 52-1, PageID.842, 844.)

Plaintiff, in his own motion, refers to his cellmates' affidavits, each of which comments upon the state of their cell following the searches.  (ECF No. 96, PageID.1690-1693; ECF No. 52, PageID.750-752 [Exhibit L, Flowers Affid.] ¶ 7; ECF No. 52, PageID.763-767 [Exhibit O, Fuqua Affid.] ¶¶ 8-9, 12-15.) Additionally, Plaintiff's own affidavit describes his cell after each search, whether it was property strewn "all over the cell's floor, bed, toilet, chair, and the cell's

---

806, 812 (8th Cir. 2006) ("It has been observed that strip searches requiring a person to disrobe completely have a 'uniquely invasive and upsetting nature[.]'") (quoting *N.G. v. Connecticut*, 382 F.3d 225, 239 (2d Cir. 2004) (Sotomayor, C.J. concurring in part and dissenting in part)); and *Hartline v. Gallo*, 546 F.3d 95, 102 (2d Cir. 2008) (as to an arrestee Plaintiff, recognizing "the uniquely intrusive nature of strip searches[.]").

sink," "foot prints and dirt being left on my clothing and bedding[,]" "tearing up

some of my legal and personal papers," and/or "damaging books."  (ECF No. 96,

PageID.1707-1716 ¶¶ 20, 30, 34, 36.)  Moreover, Plaintiff attests that, "[a]fter each

cell search, it took me days and hours worth of sorting through my paperwork and

property in order to re-organize and put things back in order so that I could use it

and continue to effectively litigat[e] pending litigation."  (ECF No. 96,

PageID.1716 ¶ 37.)  Accordingly, there is a "genuine dispute" as to whether Karl,

Odette, Trombley, Glynn, Huizar and Rozier vandalized, destroyed and/or left

Plaintiff's property in disarray when executing the cell searches on December 26th,

January 17th, January 23rd and February 1st.  Fed. R. Civ. P. 56(a).  *See, e.g., Bell v.*

*Johnson*, 308 F.3d 594, 605 (6th Cir. 2002) (as to adverse action, "Bell's evidence

shows that the defendants twice left the plaintiff's cell in disarray, confiscated his

legal papers without returning them, and stole the medical diet snacks that had

been provided to him to alleviate his weight loss from AIDS.").  In the

Undersigned's view, "there are searches…and there are *searches*."  And a search

which leaves a few things out of place is not the same as a search which looks like

the aftermath of a tornado coming through.

    In sum, Plaintiff has presented sufficient evidence to show that the cell and

strip searches, as they were allegedly conducted, "could deter a person

of ordinary firmness from engaging in protected conduct."  *Bell*, 308 F.3d at 604

(reversing district court's grant of judgment as a matter of law).

### ii.    Temporal proximity (causation)

Plaintiff makes the same argument with respect to the searches that he makes with respect to the transfers – "when the grievances are put into context, the retaliatory intent behind the Defendants' actions become[s] apparent."  (ECF No. 100, PageID.1929.)  To the extent Defendants apply the same temporal proximity argument to Plaintiff's retaliatory search claims as they do to Plaintiff's retaliatory transfer claims (*see* ECF No. 94, PageID.1518-1519; ECF No. 98, PageID.1862-1864, 1878), *i.e.*, suggest that his December 26th, January 17th, January 23rd, and February 1st searches are coincidental to his numerous grievances, Plaintiff calls this theory into question.  Specifically, Plaintiff references, *inter alia*, two phone calls from his family, the relatively small number of non-routine strip searches to which he was previously subjected in his many years of imprisonment, alleged lack of authority for the December 26th and January 17th strip searches, the scope of the cell searches, Close's response that she had not "heard Plaintiff Kitchen's name in connection with any behavior that required him to be strip searched or searched[,]" (ECF No. 100, PageID.2002 [Int. #20], ECF No. 96-1, PageID.1851 [Int. #20]), and Winn's response that, from October 7th to December 26th, he had not "received a report, memorandum, statement, or the like from staff stating that Plaintiff Kitchen was subjected to a non-routine strip search for any reason[,]"

(ECF No. 52-1, PageID.830 [Int. #6]).  (ECF No. 100, PageID.1929-1932; *see also* ECF No. 96, PageID.1700-1702.)  In other words, as was the case with Plaintiff's transfer claims, Plaintiff relies upon indicia other than the temporal proximity of his grievances and the various searches.

### iii.   Ordering, communicating or reviewing the searches (causation and motive or penological justification)

Defendants contend that five of the Defendants (Wendt, Close, Smith, Biddle, and Massick) were "penologically justified in ordering and authorizing Plaintiff's searches."  (ECF No. 94, PageID.1523-1526; *see also* ECF No. 98, PageID.1879-1881.)  The relevant evidence includes:

- Sergeant Wendt's and Captain Close's signatures on the December 26th and January 17th search forms; these forms state, *inter alia*, that "Non-routine strip searches must be <u>authorized in advance</u> by a Shift Commander or Assistant Shift Commander via the designated Sergeant.  The shakedown must be logged in the Shakedown Log Book.  This completed report must be forwarded to the Shift Commander <u>as soon as the shakedown is complete</u>."  (ECF Nos. 94-7, 94-13 (emphases added).)

- Wendt's testimony that he ordered the December 26, 2016 strip search but did not know why he believed that Plaintiff had contraband.  He also testified that he orders approximately three to five strip searches per week, or does them himself, and he did not have any memory of Plaintiff specifically.  (ECF No. 94-24, PageID.1650-1651[pp. 9-10]; ECF No. 96, PageID.1768-1769 [pp. 8-9].)

- Sgt. Smith's attestations that he "did not give orders for any staff member at SRF to search Kitchen's cell or person[,]" and,

35

while he did contact either Karl or Odette (on or about December 26th) to inform them of the need to search Kitchen, he "did not order the search."  It was ordered by his immediate supervisor, and Smith "communicated the order down the chain of command to either Karl or Odette."  (ECF No. 94-29; ECF No. 97, PageID.1855-1857 ¶¶ 2, 3.)

- Sgt. Biddle's attestation – with respect to the alleged events of December 26, 2016 – that he did not *order* any SRF staff member to search Plaintiff's cell or person; however, while he does not recall if he contacted someone to perform a search on Plaintiff, he "would have *relayed* an order to[]perform the search . . . ."  (ECF No. 94-28, PageID.1672-1674 ¶¶ 2-3 (emphasis added).)

- Odette's affidavit, wherein he describes receiving a telephone call on December 26, 2016 ordering him to conduct the strip search and logging the request in the Unit 600 logbook.  (ECF No. 94-18, PageID.1626 ¶¶ 2-3.)  The December 26th Unit 600 logbook suggests this "permission" was "obtained from Sgt. Biddle . . . ."  (ECF No. 94-8, PageID.1568.)  However, any discrepancy between Odette's statement that the caller "ordered" him and the logbook's notes regarding "permission" seems to be a matter of semantics, especially in light of Wendt's testimony that he ordered the December 26th strip search.

- Inspector Massick's testimony that he "received an anonymous kite indicating that [Plaintiff was] in possession of a weapon[,]" either in his cell or on his person.  Massick ordered one strip search of Plaintiff – the January 17, 2017 strip search.  In response to the question, "did you tell her [Close] specifically what to look for[,]" Massick answered, "[a] weapon.  Shank.  It was described as a shank."  While there was some discussion of the credibility of a kite, Massick also agreed that, a kite alone is enough to search someone, "[i]n an effort to keep safety and security of the facility[.]"  Moreover, Massick claims to discard such kites "once the search is completed and there's nothing found[.]"  (ECF No. 94-12, PageID.1585, 1587 [p. 8, 11]; ECF No. 96-1, PageID.1794-1797 [pp. 7-10]; ECF No. 98-5,

36

PageID.1916 [p. 10]; *see also* ECF No. 94, PageID.1521.)

- Close's testimony that she reviewed the January 17, 2017 strip search form "afterwards is what I'm going to assume I did, because I don't recall your situation." (*See* ECF No. 100, PageID.1992 [p. 23].)

Also, as Defendants point out, MDOC PD 04.04.110 provides that "[a] prisoner's possessions, living area, and work area are subject to search at any time, with or without suspicion that contraband is present." (ECF No. 94-27, PageID.1662 ¶ T; ECF No. 94, PageID.1521.)

Wendt's and Massick's testimony that they ordered the strip searches – each purportedly for contraband (ECF Nos. 94-7, 94-8, 94-13) – is called into question by Plaintiff's affidavit, which reflects that, in his 30-plus years of incarceration, he has "only been subjected to four (4) non-routine strip searches, and two of these occurred at SRF and are the strip searches at issue in this case." (ECF No. 96, PageID.1712 ¶ 21.) The others occurred in 2015 at Baraga Correctional Facility (AMF) and in 2019 at RMI. (*Id.*, PageID.1712-1713 ¶¶ 22-23.) Put another way, this was the first time he had been subjected to a non-routine strip search at SRF, the first time he had been "suspected" of possessing a weapon "in about twenty-five (25) years of his incarceration[,]" and the first time he underwent a cell search at SRF. (ECF No. 100, PageID.1929-1930.) Plaintiff claims that prior to filing SRF-1948, SRF-1954, SRF-1962, SRF-0097, and SRF-0124, he had "never been subjected to a cell or strip search at SRF . . . ." (ECF No. 96, PageID.1700; ECF

37

No. 96, PageID.1712-1713 ¶¶ 21-23.)  Indeed, he asserts that prior to his

December 21, 2016 e-mail kite, he had only filed one other grievance, which

related to the facility's optometrist.  (*Id.,* PageID.1701; *see also* ECF No. 31,

PageID.297 [describing SRF-2016-10-1666-12G].)  Also, Plaintiff claims that

these searches were closely preceded by his family members' two phone calls to

SRF and his submission of two grievances, seemingly SRF-1948 and SRF-1949.

(*Id.*)  Additionally, Defendants have represented that, "[u]nder MDOC policy[,]

sergeants are not designated as shift commanders or assistant shift commanders,"

(ECF No. 96, PageID.1761).  Accordingly, Plaintiff seems to question Wendt's

authority to order the search.  (ECF No. 100, PageID.1930.)  Thus, there is a

"genuine dispute" as to Wendt's and Massick's motives for ordering the December

26th and January 17th strip and/or cell searches.  Fed. R. Civ. P. 56(a).

As to the others, Plaintiff seems to question Biddle's assertion that he was

*relaying* orders, Smith's assertion about facilitating the *chain of command*, Smith's

discovery response that, with respect to the December 26th strip search, he "didn't

receive information that [Plaintiff] had a weapon[,]" (ECF No. 96, PageID.1742-

1743), and Close's testimony that she likely *reviewed* the January 17, 2017 strip

search form *afterwards*.  (ECF No. 100, PageID.1934-1935.)  However, even if

Plaintiff questions these statements – or what Smith told Odette and/or Karl about

the reasons for the December 26th strip search, Wendt and Massick have taken

38

ownership of and provided reasons for the December 26th and January 17th strip searches. There is no reason to believe that Biddle, Smith, or Close acted with retaliatory motive when communicating the December 26th strip search order or reviewing the January 17th strip search form.

### iv. Performing the searches (causation and motive or culpable state of mind)

Notably, Plaintiff contends that he was not given a reason or explanation or purpose for the searches (*id*., ¶¶ 48, 62, 68, 76). Defendants contend that six of the Defendants (Karl, Odette, Trombley, Glynn, Rozier, and Huizar) were "following orders and had no culpable state of mind to harm Plaintiff or retaliate against him." (ECF No. 94, PageID.1522-1523; *see also* ECF No. 98, PageID.1877-1879.) With respect to the December 26, 2016 searches:

- Corrections Officer Odette attests that, on December 26, 2016, he was ordered to strip search Plaintiff, he sought Officer Karl's assistance, they "performed a proper strip search in a professional manner[,]" but he does not recall being in Plaintiff's cell for the cell search. (ECF No. 94-18, PageID.1626-1627.)

- Corrections Officer Karl attests that he witnessed the December 26, 2016 strip search, which was completed in the staff locker room so that other prisoners would not see, and participated in the cell search, although he did not vandalize Plaintiff's property. (ECF No. 94-11, PageID.1581.)

- Presumably with reference to the January 17, 2017 searches, Corrections Officer Trombley attests that he did not vandalize Plaintiff's property during the cell search, he performed the strip search in accordance with MDOC policy and procedures,

the janitor closet "is only visible from the doorway[,] which is where [he] would stand to block any outside view."  (ECF No. 94-19, PageID.1630-1631 ¶¶ 2-5, 12.)

- Presumably with reference to the January 17, 2017 searches, Corrections Officer Glynn attests that his supervisor instructed him to search Plaintiff's cell and strip search Plaintiff, he conducted the strip search professionally, and he did not vandalize Plaintiff's property.  (ECF No. 94-20, PageID.1634 ¶¶ 2-5.)

- Presumably with reference to Plaintiff's claims about the January 23, 2017 *cell search*, Corrections Officer Huizar attests as did Glynn.  (ECF No. 94-22, PageID.1642 ¶¶ 2-5.)

- Presumably with reference to Plaintiff's claims about the February 1, 2017 *cell search*, Corrections Officer Rozier attests as did Glynn. (ECF No. 94-21, PageID.1638 ¶¶ 2-5.)

In response, Plaintiff notes that, "Under the Supremacy Clause, public officials have an obligation to follow the Constitution even in the midst of a contrary directive from a superior or in a policy."  *Kennedy v. City Of Cincinnati*, 595 F.3d 327, 337 (6th Cir. 2010) (brackets, quotations and citations omitted).  (ECF No. 100, PageID.1932-1933.)  Claiming that a reasonable person would have been alerted to the unconstitutionality of the orders or authorizations, Plaintiff specifically argues that, "[i]f the Defendants 'really' were just carrying out orders and searching for a dangerous weapon, then it only makes sense to have searched the entire cell that Kitchen occupied with the other prisoners."  (*Id*., PageID.1933, citing ECF No. 96-1, PageID.1800-1801 [Huizar Rsp. 4th Interrogatories] the affidavit of Breyan Fuqua #876674 (ECF No. 52, PageID.763-767 [regarding the

January 18th, January 23rd, and February 1st searches]), and the affidavit of Tommie Flowers #213557 (ECF No. 52, PageID.750-752 [regarding the December 26th search].)  Plaintiff also notes Huizar's failure to recall "which supervisor asked [him] to do the cell search[,]" (ECF No. 96-1, PageID.1801), as well as Smith and Biddle's interrogatory answers regarding contact with Odette and/or Karl (ECF No. 96, PageID.1742-1743; ECF No. 100, PageID.2005-2006, 2018-2019), and Biddle's representation that he "did not order the strip search[,]" (*id*., PageID.2010).  (ECF No. 100, PageID.1933-1934.)

Nonetheless, even if Karl, Odette, Trombley, and Glynn did not provide affidavits from or the identity of the person(s) whose orders they were following, and even if these Defendants did not provide a reason for the searches, ownership of and reasons for the December 26th and January 17th orders have been established, as discussed above.  Moreover, while Plaintiff questions the "half-hearted" scope of the cell searches, the scope may well have been due to time, as alleged by Huizar (ECF No. 96-1, PageID.1801), or the scope of the order to search.  There is no reason to believe that Karl, Odette, Trombley, or Glynn acted with retaliatory *motive* when *executing* the December 26th and January 17th strip search orders (apparently to include cell searches).  Karl, Odette, Trombley and Glynn are entitled to summary judgment to the extent Plaintiff's claims against them are based on the First Amendment retaliation or Eighth Amendment cruel

41

and unusual punishment.

On the other hand, ownership of and reasons for the January 23rd and February 1st cell searches performed by Huizar and Rozier, respectively, are not clear.  As Plaintiff points out, Huizar does not recall which supervisor asked him to do the cell search or what type of contraband he was told to seek (ECF No. 96-1, PageID.1801), and Rozier identifies Massick as having told him to perform the search, specifically stating that "Inspector Massick called the desk in Housing Unit 600 and instructed me to search for possible contraband[,]" (*id*., PageID.1811-1812).  (ECF No. 96, PageID.1699.)  Moreover, Rozier answered that he did not file a report, memorandum, or statement at the conclusion of his search, but he "verbally relayed his findings to a supervisor[,]" Inspector Massick.  (ECF No. 96-1, PageID.1814-1815.)  Yet, Massick has not confirmed that he made this request, and he is the individual from whom the Court should hear on this issue.  Thus, at this point, Huizar and Rozier are not entitled to summary judgment, because there is a genuine dispute as to the motive for the January 23rd and February 1st cell searches, particularly in the context of sparsely explained and  unfruitful December 26th and January 17th strip searches (Plaintiff's first and second such searches since 2015), the earlier of which came on the heels of Plaintiff's December 21, 2016 e-mail kite against Morris-Taylor, his December 23rd initiation of SRF-1948, and December 24th to 26th complaints by Plaintiff and his family members.  Huizar and

Rozier are not entitled to summary judgment to the extent Plaintiff's claims against them are based on the First Amendment retaliation or Eighth Amendment cruel and unusual punishment.

> **b.      Whether the strip and/or cell searches violated the Fourth and/or Fourteenth Amendments?[8]**

As for the strip searches, "it appears that any Fourteenth Amendment claim Plaintiff[] assert[s] in [his] complaint is asserted in conjunction with h[is] Fourth Amendment claim based on a violation of [his] right to privacy . . . ." *Salem v. Michigan Dep't of Corr.*, No. 13-14567, 2015 WL 1966727, at *9 (E.D. Mich. May 1, 2015) (Borman, J.), *aff'd in part*, 643 F. App'x 526 (6th Cir. 2016).  "[A] convicted prisoner maintains some reasonable expectations of privacy while in prison … even though those privacy rights may be less than those enjoyed by non-prisoners."  *Cornwell v. Dahlberg*, 963 F.2d 912, 916 (6th Cir. 1992).  "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."  *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).  *See also Stoudemire v. Michigan Dep't*

---

[8] Defendants' motion is so narrowly drafted as to the search claims (Count II) that it does not address Plaintiff's Fourth Amendment privacy claim or Fourteenth Amendment due process claim.  (*Compare* ECF No. 61, ¶ 87, *with* ECF No. 94, PageID.1520-1526; *see also* ECF No. 98, PageID.1877-1881.).  For good reason, this Court's local rules provide:  "A party must obtain leave of court to file more than one motion for summary judgment."  E.D. Mich. LR 7.1(b)(2) ("For example, *a challenge to several counts of a complaint generally must be in a single motion*.") (emphasis added).

*of Corr.*, 705 F.3d 560, 572-574 (6th Cir. 2013) (considering "degree of invasion of personal rights" and "the degree of need for the search"); *Sumpter v. Wayne Cty.*, 868 F.3d 473, 482-485 (6th Cir. 2017) (considering nature of the intrusion and penological justification).

Plaintiff describes the extent of these searches in his amended complaint, including that the latter was conducted in view of other prisoners and staff. (ECF No. 61, ¶¶ 47, 61.)  In his motion for summary judgment, Plaintiff argues that there was no legitimate penological reason to conduct the December 26th and January 17th strip searches.  (ECF No. 96, PageID.1702-1703.)  "[S]trip searches performed in view of other inmates without a legitimate penological justification violates inmates' clearly established Fourth Amendment rights."  *Salem v. Michigan Dep't of Corr.*, 643 F. App'x 526, 530 (6th Cir. 2016) (citing *Williams v. City of Cleveland*, 771 F.3d 945, 952-956 (6th Cir. 2014) and *Stoudemire*, 705 F.3d at 572-575).  Defendants have failed to move for summary judgment on Plaintiff's Fourth Amendment strip search claims; therefore, these claims should survive as to all eleven Defendants against whom Plaintiff brings Count II.

As for the cell searches, "the Fourth Amendment has no applicability to a prison cell."  *Hudson v. Palmer*, 468 U.S. 517, 536 (1984).  Moreover, although Plaintiff uses the term "substantive due process," (*see* ECF No. 61, ¶ 87 and ECF No. 96, PageID.1703), "an unauthorized intentional deprivation of property by a

44

state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson*, 468 U.S. at 533.  Therefore, Defendants are entitled to dismissal of Plaintiff's cell search-related Fourth and Fourteenth Amendment claims, even if Plaintiff is seeking compensation for the allegedly destroyed or vandalized property.  *See, e.g., Fatin v. Johnson*, 772 F.2d 906 (6th Cir. 1985) (where prison officials allegedly seized property as contraband and intentionally destroyed it, "Fatin could have filed a suit in the Michigan courts of general jurisdiction against the prison officials and received an adequate remedy.").

### 5.    Count III (IIED against all Defendants) and qualified immunity

Plaintiff's third and final cause of action is a state law claim of intentional infliction of emotional distress (IIED) against all Defendants.  (ECF No. 61 ¶¶ 89-92.)  Defendants contend that, if Plaintiff's state law IIED cause of action is the only remaining claim, then the Court should "decline supplemental jurisdiction[,]" "dismiss the state law claims without prejudice . . . [,]" and "allow Plaintiff to refile in state court."  (ECF No. 94, PageID.1526; *see also* ECF No. 98, PageID.1881.)  Defendants do not attack the IIED claim on its merits.  Defendants also contend that they are entitled to qualified immunity, because "a rational trier of fact would not conclude in this case that Defendants committed a clearly

established constitutional violation against the Plaintiff." (ECF No. 94, PageID.1526-1528; *see also* ECF No. 98, PageID.1881-1882.)

Plaintiff addresses these arguments in his own motion for summary judgment and/or in his response to Defendants' motion. (ECF Nos. 96, PageID. 1704; ECF No. 100, PageID.1935-1936.) However, if the Court agrees that at least some portions of Plaintiff's amended complaint survive summary judgment, then it is not necessary to address Defendants' 28 U.S.C. § 1367 ("Supplemental jurisdiction") argument. Moreover, Plaintiff's own single-page argument, which cites only case law and not evidence, does not merit summary judgment in his favor on his state-law claim. (ECF No. 96, PageID.1704.)

Nor is it necessary to address Defendants' qualified immunity argument, because it is conclusory or only summarily contends that they "took no adverse action against Plaintiff for filing grievances or complaints." (ECF No. 94, PageID.1528.) And, contrary to Defendants' argument, Plaintiff does have a clearly established constitutional right to be free from retaliation – including retaliation in the form of cell and strip searches – for exercising his First Amendment right to file a grievance. *See*, *e.g.*, *Stoudemire v. Michigan Dep't of Corr.*, 705 F.3d 560, 575 (6th Cir. 2013) ("Based on the state of the law in existence at the time of the strip search, it was clearly established that suspicionless strip searches were permissible as a matter of constitutional law, but only so long

46

as they were reasonable under the circumstances and performed pursuant to a legitimate penological justification."); *Bell*, 308 F.3d at 612 ("a reasonable official would have been aware that, under the *Gibbs* and *Newsom* standard, conducting harassing cell searches and confiscating an inmate's legal papers and medical dietary supplements in retaliation for the inmate's exercise of his right of access to the courts would give rise to constitutional liability.").

## F.   Conclusion

To summarize, Plaintiff's transfer-related claims (Count I) should survive summary judgment as to Morris-Taylor and Vittitow, but not as to Winn, Culberson, Foy, Haynes, or Chalker.  (Section E.3).  As for Plaintiff's search-related claims (Count II), Plaintiff's First and Eighth Amendment claims should survive summary judgment as to Wendt, Massick, Huizar and Rozier but not as to Biddle, Smith, Close, Karl, Odette, Trombley, or Glynn (Section E.4.a), Plaintiff's Fourth Amendment strip search claims should survive summary judgment as to Karl, Odette, Trombley, Glynn, Smith, Biddle, Wendt, Massick, Close, Rozier, and Huizar, but Plaintiff's cell search-related Fourth and Fourteenth Amendment claims should be dismissed as to these eleven Defendants.  (Section E.4.b).  Finally, no party is entitled to summary judgment on the IIED claim, nor are Defendants entitled to qualified immunity on any of the surviving federal constitutional claims.  (Section E.5.)  Accordingly, the Court should **GRANT IN**

PART and **DENY IN PART** the parties' cross-motions for summary judgment

(ECF Nos. 94, 96).

## III.    PROCEDURE ON OBJECTIONS:

The parties to this action may object to and seek review of this Report and

Recommendation, but are required to file any objections within 14 days of service,

as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule

72.1(d).  Failure to file specific objections constitutes a waiver of any further right

of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health &*

*Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some

issues but fail to raise others with specificity will not preserve all the objections a

party might have to this Report and Recommendation.  *Willis v. Sec'y of Health &*

*Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of*

*Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule

72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No.

2," *etc.*  Any objection must recite precisely the provision of this Report and

Recommendation to which it pertains.  Not later than 14 days after service of an

objection, the opposing party may file a concise response proportionate to the

objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR

72.1(d).  The response must specifically address each issue raised in the objections,

in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.* If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated: August 9, 2020                    s/*Anthony P. Patti*
                                          Anthony P. Patti
                                          UNITED STATES MAGISTRATE JUDGE